## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHNELLE GILL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. CIV-22-340-SPS** |
| | ) | |
| MARTIN O'MALLEY,[1] | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

The claimant Johnelle Gill requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g).  She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled.  For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security.  In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kiakazi as the Defendant in this action.

engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A).  Social security regulations implement a five-step sequential process to evaluate a disability claim.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  The Court may not reweigh the evidence or substitute its discretion for the Commissioner's.  *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991).  But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  *See also Casias*, 933 F.2d at 800-01.

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities.  If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied.  If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1.  If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry.  Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work.  At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC.  Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work.  *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

## Claimant's Background

Claimant was born on July 20, 1969, and was 46 years old on the alleged disability onset date. (Tr. 55, 211, 248).  She was 49 years old on September 30, 2018, when she was last insured for disability insurance benefits.[3] (Tr. 15, 26, 53, 245). She has completed her GED and has past relevant work experience as a hand packager, and nurse assistant. (Tr. 26, 71, 249-250).  Claimant alleges she has been unable to work since her application onset date of December 1, 2015, initially alleging disability due to issues with diabetes (with resulting neuropathy and ketoacidosis), depression, and posttraumatic stress disorder (PTSD). (Tr. 55, 211, 248).

## Procedural History

On August 19, 2020, Claimant filed an application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. (Tr. 211-215).  Her application was denied. After administrative hearings on June 24, 2021 and February 24, 2022 (Tr. 35-50, 51-74), ALJ Edwin Starr determined that Claimant was not disabled in a written opinion dated March 31, 2022. (Tr. 12-34).  On October 5, 2022, the Appeals Council denied review, so the ALJ's written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 404.981.

### Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation, finding that although the Claimant could not return to any of her past relevant work, she was nevertheless not disabled because there was other work she could perform in the national economy.  At step two, the ALJ

---

[3] "Under Title II, a period of disability cannot begin after a worker's disability insured status has expired." Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *8. Evidence is relevant only if it pertains to Plaintiff's abilities prior to her DLI. *See Huston v. Bowen*, 838 F.2d 1125, 1127 (10th Cir. 1988) (eligibility for DIB turns on the severity of impairments prior to the DLI).

found that the Claimant had severe impairments of type II diabetes, degenerative disc disease and

anxiety disorder. (Tr. 17). At step three, the ALJ found that these impairments did not meet any

criteria of any of the listed impairments. (Tr. 18).  At step four, the ALJ found that the Claimant

retained the residual functional capacity ("RFC") to perform sedentary work with the following

limitations: no climbing ropes, ladders, or scaffolds; avoiding hazards such as moving machinery

or unprotected heights; frequent reaching, fingering and handling bilaterally; occasional operating

foot controls bilaterally; occasional climbing stairs and ramps, balancing, kneeling, stooping,

crouching and crawling; and avoiding even moderate exposure to pulmonary irritants like dusts,

odors, and gases.  The ALJ also found that the Claimant's RFC limited her to work consisting of

simple and routine tasks and responding to simple, direct and concrete supervision. (Tr. 19). The

ALJ concluded that the Claimant could not return to any of her past relevant work and proceeded

to step five, where he determined that the Claimant was not disabled because there was work she

could perform in the national economy, *e.g.*, document preparer, and circuit board assembler. (Tr.

27).

## Review

The claimant contends, *inter alia*, that the ALJ erred in considering evidence provided by

Dr. Kindrick and Mr. Gattis as to her mental limitations in determining her RFC.  The Court agrees

that the ALJ did commit reversible error in this regard, and the decision of the Commissioner must

therefore be reversed and the case remanded for further proceedings.[4]

The evidence before the ALJ reflects that prior to Claimant's onset date, she had a history

of abdominal pain and elevated blood glucose levels. (Tr. 20).  In August 2014, she presented to

---

[4]   The claimant contends that the ALJ committed a number of other errors in evaluating her
RFC.  The Court declines to address those contention because it finds the ALJ's failure to proper
analyze the opinions of Dr. Kindrick and Mr. Gattis to be dispositive.

the hospital emergency room for upper abdominal pain, and lab work showed her blood glucose level to be 309. (Tr. 2265-2270). She was released the following day, with diagnosis of epigastric pain and a urinary tract infection. In addition, her hyperglycemia was characterized as new and required workup. Lab work in October 2014 also showed high glucose. (Tr. 2256-2264).

For the period between Claimant's alleged onset date in December 2015 and her date last insured in September 2018, there are few treatment records. However, in later records from 2019, Claimant stated the onset of her back, leg, and foot pain began in 2015, with gradual worsening over time. (Tr. 2175).

In October 2016, Claimant was rearended while stopped in her vehicle and she presented to the emergency room for neck, back, and left-hand pain. (Tr. 1814-2182). Lumbar and left wrist x-rays were unremarkable; and cervical and spine x-rays showed mild disc space narrowing at C4-5. (Tr. 2339-2347).

On September 2, 2017, Claimant returned to the emergency department for nonspecific abdominal pain and nausea/vomiting. (Tr. 2241). It was noted that she was on no diabetes medication at home, that she reported that she did not have a way to check her blood sugar at home, and that she refused to start metformin. (Tr. 228). Her past medical history included diagnoses for anxiety, diabetes, and hypertension. She was admitted for observation, and during the hospitalization, a case coordinator acquired a glucose meter and test strips for the claimant. She also was started Amaryl and Tradjenta with improvement of her blood sugars; her nausea and vomiting resolved. In addition, she was started on lisinopril for elevated blood pressure. At discharge, she was provided one month's worth of medication to give her time to establish with a PCP. (Tr. 2220, 2224, 2228, 2233, 2235).

Various subsequent records in 2017 continued to show consistently elevated blood glucose levels (including 373 and 217 in September 2017, and 220 in November 2017). (Tr. 2292, 2318, 2323).

Claimant returned to the emergency room on November 21, 2017, due to another episode of intractable vomiting, nausea, and abdominal pain. (Tr. 2218). Claimant reported that she had been non-compliant with her medications, including that she had not taken them for at least two weeks after running out. She stated that she was unable to afford Tradjenta because she has no insurance. (Tr. 2211, 2215). At admission, her blood sugar was 358 and she was ketone positive. Her principal problem was assessed as type 2 diabetes with ketoacidosis, and her active problems were epigastric pain, urinary tract infection, nausea and vomiting, and non-compliance with medical treatment. (TR. 2199). She was counseled on medication compliance and started on metformin, and upon discharge, was to resume her normal activities. She was again advised on better medication compliance. (Tr. 2199- 2210).

Claimant returned to the emergency room on January 7, 2018, for vomiting and epigastric pain. (Tr. 2187). Her blood glucose was 263.  (Tr. 2190). Her assessments included ketosis and type III diabetes. (Tr. 2189). The claimant elected to not be admitted, because she wished to pursue outpatient treatment. (Tr. 2192).

On March 14, 2018, Claimant was hospitalized two days due for abdominal pain, nausea, and vomiting for two days. (Tr. 1677). Once appendicitis was ruled out, she was diagnosed with chronic constipation. She was advised to follow up for her PCP and be on a strict bowel regimen. It also was noted that she was an insulin-dependent diabetic, that the condition was uncontrolled with an A1c of 9.4, and that she had hypokalemia as well. (Tr. 1677-1679, 1683, 1685).

Claimant established care with a physician in May 2018. (Tr. 2391). Her problem list included diabetes, diabetic neuropathy, essential hypertension, and GERD. She was currently a one-pack of cigarettes per day smoker. Her blood glucose level at the appointment was 217 (high). It was noted that she was non-compliant as to her diabetes, including doses of medication; that she reported associated symptoms such as dizziness, increased appetite, and foot numbness; and that she also continued to have abdominal pain. An exam showed no acute distress, anxious and agitated affect, no dyspnea and normal lung sounds, normal ambulation, normal muscle strength and tone, normal gait and station, no edema in her extremities, grossly intact sensation, and tenderness to palpation in her back with decreased range of motion. Her assessments were uncontrolled type 2 diabetes, for which she was continued on metformin and glipizide (and no additional prescriptions were added due to lack of insurance); diabetic peripheral neuropathy, worsening, for which she was prescribed Lyrica 75 mg; uncontrolled hypertension, for which she was prescribed losartan 100 mg; gastroparesis due to type 2 diabetes, stable with Reglan; GERD, worsening, for which she was continued on omeprazole 40 mg; hyperlipidemia; stable with diet and lovestatin 10 mg, and nausea and vomiting, for which she was prescribed Zofran 8 mg. She was counseled on following a strict diabetic diet and to check her blood glucose levels every day. (Tr. 2391-2393).

An endoscopy in early June 2018 showed mild to moderate, non-bleeding, and non-erosivegastritis. (Tr. 2390). The same month, she returned to her physician for elevated glucose levels, foot numbness, low back pain, pain on both sides, and fatigue. The treatment notes continued to characterize the claimant as non-compliant with medications. An exam showed she was in no acute distress, had an anxious and agitated affect, had no dyspnea, ambulated normally, had normal muscle strength and tone, had normal station and gait, had grossly intact sensation,

and had tenderness to palpation in her back with decreased range of motion. Her assessments were uncontrolled diabetes, with an A1c greater than 10 at last check. Tradjenta was again added to her regimen, and she was advised on the need for insulin, which the claimant currently refused. Her other assessments remained the same. (Tr. 2386-2390).

At a follow-up in early September 2018, it was noted that the claimant now was taking metformin, glipizide, 25 units of Tresiba, Tradjenta, and other medications. An exam remained generally consistent with prior exams, including normal ambulation, normal gait and station, grossly intact sensation, and lower back tenderness with reduced range of motion. (Tr. 2380-2385).

After her date last insured, the claimant continued to be treated for gastroparesis due to diabetes, mixed hyperlipidemia, and intractable nausea and vomiting (secondary to diabetic gastroparesis). (Tr. 470). Multiple times, it was noted that the claimant was not consistent or compliant with her diabetes or gastroparesis—including a statement in January 2019 that she had not taken her medications for one month. (Tr. 601, 739, 752, 1458,1472, 1537, 1546). An EGD in January 2019 showed no significant abnormalities. (Tr. 621).

Claimant was hospitalized five days in February 2019 for diabetic ketoacidosis. (Tr. 601, 605, 624, 662). In March and May 2019, the claimant presented to the hospital emergency department for episodes of vomiting 10 or more times per day, along with other symptoms such as abdominal pain and mild diarrhea. On both occasions, the claimant stated that she was not comfortable returning home while still nauseated, and she was admitted for observation, administration of fluids and anti-nausea medication, and other treatment (including antibiotics for a urinary tract infection in May). (Tr. 509,533-534, 547, 555). At a hospital follow-up with her PCP in June 2019, it was noted that her nausea/vomiting was improved with Zofran and that her diabetes was not well-controlled. An exam showed she was healthy appearing, in no acute distress,

ambulated normally, had anxious and abnormal affect, had normal recent and remote memory, had no dyspnea, had normal motor strength and tone, had normal gait, and had grossly intact sensation and motor exam. (Tr. 2360-2362).

As of August 2019, electrodiagnostic studies supported a diagnosis of generalized sensorimotor polyneuropathy that was likely secondary to diabetes. The claimant reported symptoms that included numbness in her legs and feet, some pain and weakness in her calves and soles of her feet, occasional falls, and low back pain. An exam at that time showed decreased sensation in a stocking distribution, negative straight leg raises, pedal edema in both feet, and independent gait. (Tr. 485).

In August and September 2019, the claimant reported that her gastroparesis symptoms had been significantly improved once she started Reglan and began walking after each meal (although she struggled with constipation). (Tr. 501, 505).

Into 2020, the claimant continued to receive consistent treatment for her conditions. As of March 2020, the claimant reported that her gastroparesis symptoms were controlled with Reglan 10 mg four times daily, and that her GERD was controlled with omeprazole 20 mg. (Tr. 496). In August 2020, she reported frequent falls due to neuropathy and that she was unable to stand for extended periods of time due to pain. (Tr. 1555). The same month, she was prescribed a quad cane to help with balance. (Tr. 2449-2450). In late 2020 and into early 2021, the claimant also had normal gait and station, the ability to perform conventional walking without difficulty, no noted use of an assistive device, no distress, and full strength in her lower extremities. (Tr. 1820, 1823, 1837,1887-1888). In late 2020 Claimant continued to have chronic pain in her lumbar spine, legs, and feet; and tenderness in her cervical spine. She also reported the relatively recent onset of

shoulder pain and dysfunction. (Tr. 1837, 1844). Screenings at various times in 2020 and 2021 indicated mild or moderate depression and anxiety disorder. (Tr. 1848, 1878).

As to her mental impairments, Plaintiff saw nurse practitioner James Gattis for mental health treatment beginning on October 29, 2019. Dr. Gattis wrote a diagnostic assessment indicating Claimant had a lifelong history of depression given that she was molested as a child around the age of 9. (Tr. 1591). Claimant endorsed anhedonia, withdrawal, and other significant traumatic events in her life including being raped by her uncle at the age of 16. *Id.* Her depression was compounded by her medical problems three years ago when she was hospitalized nine times in one year. *Id.* She began experiencing excessive worry, intrusive and ruminating thoughts, and psychomotor restlessness. *Id.* Mr. Gattis noted these symptoms on exam, as did Claimant's other treating practitioners. (Tr. 1549, 1560, 1589, 1591). Consequently, Mr. Gattis diagnosed Claimant with post-traumatic stress disorder ("*PTSD*"), major depressive disorder (recurrent, severe), generalized anxiety disorder, and personality disorder unspecified. (Tr. 1577).

In addition to Claimant's Lexapro, he started her on Buspar. Eventually, Claimant would be prescribed clonazepam for her serious anxiety. (Tr. 1546). Dr. Gattis assessed Claimant as suffering from severe anxiety, poor motivation and energy, social withdrawal, anhedonia, avoidance, hypervigilance, intrusive thoughts, rumination, and panic, opining that her symptoms related back to the time at issue. (Tr. 1591). Dr. Gattis specifically stated Claimant's symptoms of "severe anxiety" began three years ago. *Id*. This is consistent with Claimant's husband's statements who stated her anxiety and depression started years ago after her hospitalization issues at Heber hospital in 2017. (Tr. 40, 48, 69).

Claimant's husband stated her depression was to the point that even before her DLI, he acted as her proxy in hospitals and fills out forms on her behalf because her memory is so poor.

(Tr. 46, 68). This is consistent with the record as even in 2017, Claimant appeared tearful, anxious, and crying. (Tr. 2242). Her husband had to speak for all her communications. (Tr. 2242). Nonetheless, the ALJ does not explain why he did not find this opinion either supported by the notations provided or consistent with the nonmedical sources in the claim. 20 CFR §§ 404.1520c(c)(1) and (2). Instead, the ALJ concludes the opinion is not relevant. A psychiatrist at nurse practitioner Gattis' practice, Dr. William Kindrick, opined that, as of July 30, 2020, Plaintiff had no useful ability to function on a sustained basis in multiple areas (Tr. 1533).

In August 2021, a medical expert, neurologist Dr. Steven Goldstein, reviewed the record to evaluate Plaintiff's physical abilities prior to her DLI (Tr. 2438-46; *see* Tr. 2448 (curriculum vitae)). Dr. Goldstein opined that Plaintiff had abilities consistent with a restricted range of sedentary work (Tr. 2442-45). *See* 20 C.F.R. § 404.1567(a) (defining sedentary work).

In evaluating the claimant's mental limitations, the ALJ summarized the expert evidence as follows:

> The undersigned also considered the mental residual functional capacity provided by Dr. William Kindrick (psychiatrist) and Mr. James Gattis, APRN. They indicated that the claimant had no useful ability to function on a sustained basis in various areas of functioning, including maintaining attention and concentration for extended periods, maintaining a schedule/regular attendance, responding appropriately to co-workers and usual work setting, behaving in an emotionally-stable manner, and working with deterioration or decompensation.

(Tr. 25).  The ALJ did not, however, evaluate this evidence for supportability and consistency in accordance with the governing regulations;

> When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will

articulate how we considered the medical opinions and prior administrative medical
findings in your claim according to paragraph (b) of this section.

20 C.F.R. § 404.1520b(a).  *See also* 20 C.F.R. § 416.920b(a).  The Commissioner concedes this

was error by the ALJ but asserts it was harmless because evidence in question was from a period

after the claimant's date last insured.  *See* Docket No. 18, p. 12 ("Given that these providers did

not treat Plaintiff during the relevant period and their opinion pertained on its face to Plaintiff's

condition years after her DLI, the Court should find that the ALJ's omission of any discussion of

the supportability and consistency factors was harmless.").  Indeed, this was the only reason given

by the ALJ for rejecting the opinion evidence from Dr. Kindrick and Mr. Gattis.  (Tr. 25) ("Dr.

Kindrick/Mr. Gattis indicated that their assessments applied from July 30, 2020, to present. (Exh.

6F). The undersigned finds that their assessments do not apply to the period between 2015 and

2017 (according to their own statement) and, therefore, cannot be found persuasive.").

It is true that in order to receive social security benefits, a claimant must establish that she

was disabled *prior to* the date she was last insured.  *See, e. g., Adams v. Chater,* 93 F.3d 712, 714

(10th Cir. 1996) ("The parties agree that claimant met the earnings requirements of the Social

Security Act (Act), 42 U.S.C. §§ 401- 433, only through December 31, 1988. Therefore, in order

to receive benefits, claimant must establish his disability prior to that date."), *citing Henrie v.*

*United States Department of Health & Human Services,* 13 F.3d 359, 360 (10th Cir. 1993).  *See*

*also Potter v. Secretary of Health & Human Services,* 905 F.2d 1346, 1348-49 (10 th Cir. 1990)

("[T]he relevant analysis is whether the claimant was actually *disabled* prior to the expiration of

her insured status."), *citing Swanson v. Secretary of Health Human Services,* 763 F.2d 1061, 1065

(9th Cir. 1985).  However, evidence of a claimant's condition after the termination of insured status

may be relevant to the existence or severity of an impairment arising before termination.  *See, e.*

*g., Basinger v. Heckler,* 725 F.2d 1166, 1169 (8th Cir. 1984) ("[M]edical evidence of a claimant's

condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status.") [citations omitted].  There was evidence in the record that the limitations observed by Dr. Kindrick and Mr. Gattis may have arisen while the claimant was insured: (i) Mr. Gattis stated that the claimant's "severe anxiety" began three years previous; (ii) the claimant's spouse testified that her mental health issues related back to the time at issue and were as severe as they currently were; (iii) the claimant's medical records indicated lengthy and significant issues due to her medical PTSD, including forgetting to take crucial medication to her own detriment and relying on her husband for basic life activities. (Tr. 622, 624, 658, 704, 1529, 1548, 1549, 1558, 1559, 1587, 1589, 1591, 1688, 2218, 2242, 2370).  The ALJ should at a minimum have explained why this evidence did support a disability prior to the claimant's date last insured based on the limitations imposed by Dr. Kindrick and Mr. Gattis after that period.  *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir.1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence that he rejects.") [citation omitted].

Accordingly, the decision of the Commissioner must be reversed and the case remanded to the ALJ for further analysis of the claimant's RFC, in particular whether any additional mental limitations should be included.  If the ALJ's subsequent analysis results in any changes to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

In summary, the Court finds that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. Accordingly, the

decision of the Commissioner is hereby **REVERSED and REMANDED** for further proceedings

consistent with this Opinion and Order.

      **IT IS SO ORDERED this 20th day of March, 2024**.

_____
STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE


.